UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER N. SCHOENFELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-CV-439 PLC |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security[1], | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM AND ORDER

Plaintiff Jennifer N. Schoenfeld seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi, denying her application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

I.      **Standards for Determining Disability Under the Social Security Act**

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At step one, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At step two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(ii); *McCoy*, 648 F.3d at 611.  To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  At step three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611.  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to step four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 416.920(a)(4), which is "the most [a claimant] can still do despite [his or her] limitations," 20 C.F.R. § 416.945(a)(1). *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).  At step four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  At step five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.960(c)(2).

## II.    Background, Procedural History, Evidence Before the ALJ, and ALJ Decisions

On February 7, 2018, Plaintiff filed an application for SSI, alleging she was disabled as of that date due to osteogenesis imperfecta, anxiety, post-traumatic stress disorder, polycystic ovarian

syndrome (PCOS), depression, and asthma.[2]  (Tr. 78)  The Social Security Administration (SSA) initially denied Plaintiff's claim in July 2018, and she filed a timely request for a hearing before an administrative law judge (ALJ).   (Tr. 125-129, 132)  The SSA granted Plaintiff's request for review and conducted a hearing in September 2019.   (Tr. 33-53)

Plaintiff, born June 25, 1985, testified during the first hearing before the ALJ that during a walk in November, 2016, she slipped on the sidewalk, fell, and broke her arm in three places.  (Tr. 39, 41)  She stated she had undergone five surgeries, the first in November, 2016. (Tr. 41)  Plaintiff described the sequence of surgeries and reasons therefore as follows:

> Well, the first chunk of metal they put in my elbow, it was grinding on my humerus because it was too big, which was making my humeral head deteriorate.  So, they took that out, put a different chunk in, but it was still causing me extreme pain.  So, they took that piece of metal out and said oh, it's going to be fine with nothing, which was not accurate.

> I was having extreme pain in my elbow, still, my wrist.  Had gotten Cortisone shots, that didn't help.  Went and saw a different physician, she cut my ulna in half.  And that was, I think, the fourth surgery.  She cut my ulna in half, took a chunk out, put it back together with screws and plates.  And then this past July, had another surgery to take the screws and plates out and put a rod in it.[3]

(*Id.*)  Plaintiff further reported daily numbness, a tendency to drop items, and difficulty with shifting gears in the car, brushing her hair, writing, typing on a computer, tying her shoelaces, and buttoning her pants.  (Tr. 42-43)  During the hearing Plaintiff wore a brace that she had received after her first surgery, and stated the purpose was to prevent her bone from shattering in the event she bumped it.  (Tr. 44)

---

[2] Plaintiff does not challenge the ALJ's determination that she was not under a disability as defined in the Social Security Act due to her PCOS, asthma, or alleged mental impairments, and so the Court does not discuss the finding in its Order.

[3] Plaintiff testified that the rod was placed because without it, she ran the risk of her bone snapping in two if she fell again.  (Tr. 42)

With respect to her abilities and activities, Plaintiff testified that while her doctors had not released her to any lifting with the right upper extremity, she believed she could lift ten pounds total with two hands.  (Tr. 45-46)  Outside of taking her children to school, Plaintiff reported she often spent her time resting on the couch or in her bed.  (Tr. 47)  She did acknowledge going to church twice a week, but said she only made grocery lists online and let her husband pick up the items on his way home from work.  (Tr. 48)

A vocational expert testified at the September, 2019 hearing.  (Tr. 49-52)  The ALJ asked the vocational expert to consider a hypothetical individual of Plaintiff's age, education, and no past relevant work experience, with the following limitations:

> [A]ssume that this individual is limited to work at the sedentary exertion level.  However, they can never climb ropes, ladders or scaffolds; can only occasionally climb ramps and stairs, balance, stoop and kneel; but can never crawl; can have no concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, and respiratory irritants such as dusts, fumes, odors, gases, and poor ventilation.
>
> No exposure to unprotected heights or hazardous machinery; can frequently reach, handle, finger, and feel; and is able to perform simple, routine tasks; but can have only minimal changes in job setting and duties; and no fast-paced production work.  Could the hypothetical individual perform any work in the national economy?

(Tr. 49-50)  The vocational expert stated that there existed unskilled jobs in the national economy that such an individual could perform, such as addresser, document preparer, and information clerk.[4]  (Tr. 50)  The ALJ then changed the hypothetical, to specify an individual who could only occasionally reach, handle, finger, and feel with the dominant right upper extremity.  (*Id.*)  After clarifying that the individual was right-handed (as Plaintiff is), the vocational expert responded that sedentary work required good bimanual dexterity, and the only job requiring less than

---

[4] The vocational expert noted that all of her proposed jobs were classified as sedentary.  (Tr. 50)

5

"frequently" was "under discussion as to whether or not [it] was really unskilled."  (Tr. 50-51)[5]
The ALJ therefore determined there were insufficient jobs in the national economy under that
scenario, given that the status of the only possible position was unclear.  (Tr. 51)

In response to questioning from Plaintiff's attorney, the vocational expert further opined
that employers typically expect employees to be on-task outside of designated breaks.  (Tr. 51)
With respect to absenteeism, she stated that "usually one day per month would be acceptable, but
any more than that would be over and above what's allowable."  (Tr. 52)

In a decision dated November 21, 2019, the ALJ applied the five-step evaluation set forth
in 20 C.F.R. § 416.920 and found that Plaintiff:  (1) had not engaged in substantial gainful activity
since February 7, 2018, the application date; and (2) had the severe impairments of osteogenesis
imperfecta type 1, degenerative joint disease of the right elbow, degenerative joint disease of the
right wrist status post arthroscopy and ulnar shortening osteotomy, asthma, and obesity, that
significantly limited her ability to perform basic work activities as required by SSR 85-28.  (Tr.
101)[6]

At step three, the ALJ found that Plaintiff did not have an impairment or combination of
impairments that met or medically equaled the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  (Tr.
103)  In so finding, the ALJ stated as follows:

> No medical expert has opined a listing is met and the claimant does not
> argue a listing is met.  The record does not establish the medical signs,
> symptoms, laboratory findings or degree of functional limitation required
> to meet or equal the criteria of any listed impairment.

---

[5] The position the ALJ referred to was surveillance system monitor.  (Tr. 51)
[6] The ALJ found Plaintiff's PCOS, hypertension, hypokalemia, vitamin D deficiency, and
gastroesophageal reflux disease (GERD) were nonsevere physical impairments, as the medical
records did not show they had more than a minimal effect on Plaintiff's ability to perform basic
work activities, and they were generally well-managed with conservative treatment.  (Tr. 101)

> The undersigned considered Listing 1.02, relating to major dysfunction of a joint.  However, the record contains no evidence of gross anatomical deformity resulting in an inability to perform fine and gross movements of a major peripheral joint in the upper extremity effectively.  As discussed in detail below, recent medical notes indicate the claimant exhibits full motion and strength in her upper extremities.  (Exhibit 17F/22.)  She reports doing well, with controlled post-surgery pain, and on examination there is excellent motion, normal neurological function, and satisfactory strength.  (Exhibit 20F/4.)  There is no evidence of complication or medical evidence suggesting the claimant will not heal properly.  There is no evidence of post-surgery complaints suggesting the surgery was not successful.  (Exhibit 23F; 24F.)  Treatment notes state the claimant is progressing as expected and healing appropriately.  (Exhibit 20F/5.)  Therefore, the claimant's condition does not reach the severity level required to meet Listing 1.02.  For the same reasons, the undersigned finds no evidence that would satisfy the requirements of Listing 1.07.  There is no evidence of an upper extremity fracture with non-union, under continuing surgical management, directed toward restoration of functional use of the extremity, along with evidence that function was not restored or expected to be restored within 12 months of onset.  Despite the claimant's numerous surgeries, as discussed below, there were only brief periods of non-functionality post-surgery, and each time function was ultimately returned, albeit with some ongoing symptoms.

(Tr. 104-105)

The ALJ found that, although "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms", "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 105)  As support, she recounted in detail the nature of each of Plaintiff's prior surgeries, and the outcomes with respect to functionality.  (Tr. 105-106)  The ALJ concluded her recitation as follows: "[Plaintiff's] doctor observes her recent surgery and states she has 'limited use' of her arm 'for any sort of basic, and certainly occupational activities.'  However, this observation was made while the claimant is still in her cast post-surgery."  (Tr. 106 (internal citation omitted))  The ALJ further cited to Plaintiff's reporting during a consultative examination, her function report, and her testimony

7

during the hearing to conclude Plaintiff was able to engage in a wide variety of daily activities.

(*Id.*)

The ALJ concluded as follows:

> In sum, the claimant indeed has some problems with her right upper extremity.  She was treated first before the period at issue, and by the time of her disability application date she was healed.  The claimant's upper extremity problems did not return in any significant way until November 2018, leading to additional surgeries.  However, there is no 12-month duration for loss of use of her arm, or any indication she has not improved, as discussed above.  As noted, the claimant has had various surgeries followed by periods of non-use of her upper extremity, but by-and-large, the claimant has been able to use her upper extremity, with some symptoms.  Even when her symptoms are increased, physical examinations tend to show full range of motion and strength.

(Tr. 107)

After "careful consideration of the entire record", the ALJ determined that Plaintiff had the

RFC to perform sedentary work, except that:

> she can never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, balance, stoop, and kneel; never crawl; have no concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, and respiratory irritants such as dust, fumes, odors, gases, and poor ventilation; have no exposure to unprotected heights or hazardous machinery; and frequently reach, handle, finger, and feel.

(Tr. 104)  With respect to Plaintiff's ability to frequently reach, handle, finger and feel, the ALJ

explained as follows:

> As noted, after the January 2019 right wrist arthroplasty and ulnar shortening ostomy, the claimant healed well (Exhibit 14F/18) and she had 5/5 strength in the upper extremities.  (Exhibit 11F/3.)  By June 2019 the claimant reported she was back to normal activities and an examination was unremarkable.  (Exhibit 13F/22.)  Prior to the July 2019 hardware removal and nailing, the claimant reported doing well overall, with some discomfort over her hardware.  (Exhibit 14F/1.)  Post-surgery imaging shows healing, with no complication.  (Exhibit 19F.)  She exhibits full motion and strength in her upper extremities.  (Exhibit 17F/22.)  She reports doing well, with controlled post-surgery pain, and on examination there is excellent motion, normal neurological function, and satisfactory strength.  (Exhibit 20F/4.)

8

> There is no evidence of complication or medical evidence suggesting the claimant will not heal properly.  There is no evidence of post-surgery complaints suggesting the surgery was not successful.  (Exhibit 23F; 24F.)  Treatment notes state the claimant is progressing as expected and healing appropriately.  (Exhibit 20F/5.)  There is no medical evidence that demonstrates the claimant is so limited that she cannot frequently reach, handle, finger, and feel.

(Tr. 107-108)

Based on the vocational expert's testimony, the ALJ found that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy, such as addresser, document preparer, and information clerk.  (Tr. 110)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since February 7, 2018, the date the application was filed.  (Tr. 111)

Plaintiff subsequently filed a request for review of the ALJ's November, 2019 decision with the SSA Appeals Council.  (Tr. 184-186)  The SSA Appeals Council granted Plaintiff's request for review, vacated the hearing decision, and remanded the case to the ALJ for resolution of the following issue:

> The Administrative Law Jude [sic] found the claimant has the residual functional capacity assessment to perform a range of sedentary work that includes frequent reaching, handling, fingering, and feeling (Finding 4).  In reaching this assessment, the Administrative Law Judge indicated there is no evidence of complication or medical evidence suggesting the claimant will not heal properly subsequent to her right upper extremity surgery in July 2019, and that there is no evidence of post-surgery complaints suggesting the surgery was not successful (Decision, pages 9-10).  However, evidence dated August 2019 indicates the claimant continues to struggle with her right upper extremity.  A treating source indicated at the time that the claimant has limited use of her arm for any sort of basic, and certainly occupational activities (Exhibit 21F/1, 7).  The claimant also reported on September 4, 2019, as well as at the hearing held on September 17, 2019, that she continues to have pain and other issues with her right upper extremity (Exhibit 23F/7; Hearing Recording 10:56:00).  Further consideration is warranted.

9

(Tr. 119)  The SSA Appeals Council directed that upon remand, the Administrative Law Judge was to:

> Obtain additional evidence concerning the claimant's right upper extremity impairments, including updated treating records, in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence (20 CFR 416.912-913).
>
> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 416.945 and Social Security Ruling 96-8p).
>
> If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 96-9p).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 119-120)

The SSA conducted a second hearing in March 2021.  (Tr. 54-76)  Plaintiff testified that she lived with her husband (from whom she was separated) and children in a home.  (Tr. 63)  Plaintiff explained that she made grocery lists for the family, typically by utilizing the voice to text feature on her phone, and her husband would do the shopping.  (Tr. 64)  She testified that she did not wear shirts with buttons, because they were "hard", that she wore a sports bra and elastic pants (with no zipper), and that she typically tied her shoes one time and then slid them on and off.  (Tr. 65-66)  She explained that she only showered when her husband was at home, in case she experienced a problem, and that while she enjoyed reading and crocheting, her arm precluded her

from doing the latter very often.  (Tr. 70)  Plaintiff stated she was capable of lifting five pounds

with either arm, "on a good day".  (Tr. 64)

After noting that Plaintiff had numerous follow-up appointments regarding her right arm

in 2018 and 2019, the ALJ asked why there was not as much follow-up in 2020.  (Tr. 66-67)

Plaintiff responded that she tried to avoid going out due to the pandemic.  (Tr. 67)  She further

stated that after having lived with her condition her entire life, she knew the advice she would

receive should she visit a physician.[7]  (*Id.*)

A vocational expert testified at the second hearing.  (Tr. 71-75)  The ALJ asked the

vocational expert to consider a hypothetical individual of Plaintiff's age, education, and no past

relevant work experience, with the following limitations:

> [A]ssume that this individual is limited to work at the sedentary exertion
> level.  However, they can never climb ropes, ladders or scaffolds, can only
> occasionally climb ramps and stairs, occasionally balance as defined in the
> DOT and the SCO, occasionally stoop and kneel, but never crawl and have
> no concentrated exposure to extreme heat, extreme cold, wetness, humidity,
> vibration and respiratory irritants such as dusts, fumes, odors, gases and
> poor ventilation.
>
> And, have no exposure to unprotected heights or hazardous machinery.  Can
> frequently reach, handle[,] finger and feel.  Is able to learn, remember and
> carry out simple, routine tasks.  Is able to use reason and judgment to make
> simple, routine work-related decision[s].  Is able to work at an appropriate
> and consistent pace while performing simple, routine tasks.  Is able to
> complete simple, routine tasks in a timely manner.  Is able to ignore or avoid
> distractions while performing simple, routine tasks, but must have only
> gradual changes in job settings and duties.
>
> Is able to sustain an ordinary routine and regular attendance at work while
> performing simple, routine tasks.  Is able to work a full day without anymore
> than the allotted number or length of rest periods during the day while

---

[7] Plaintiff testified as follows:  "I've lived with this my entire life and so, I pretty much already
know they're going to say ice, heat, elevate, ibuprofen, you know.  It's the same story, different
day, but I'm also not getting out because there's a pandemic.  So, I have called and left messages
if there's something new going on.  But, if I went to the doctor every time something hurt, I would
be there much too frequently."  (Tr. 67)

> performing simple, routine tasks. Can have no contact with the general public, but is able to occasionally work close to or with coworkers and supervisors without interrupting or distracting them while performing simple, routine tasks and can perform no fast paced production work. Can the hypothetical individual perform any work in the national economy?

(Tr. 72-73) The vocational expert stated that there existed unskilled jobs in the national economy that such an individual could perform, such as addresser, document preparer, and cutter-paster.[8] (Tr. 73) The ALJ then changed the hypothetical, to specify an individual who could only occasionally reach, handle, finger, and feel. (*Id.*) When asked if such an individual could perform any work in the national economy, the vocational expert responded as follows: "No, Your Honor, sedentary work requires good bimanual dexterity." (*Id.*) In response to questioning from Plaintiff's attorney, the vocational expert further opined that outside of allowable breaks, employers typically expect employees to be on-task 90-100% of the time. (Tr. 74)

In a decision dated July 6, 2021, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and found that Plaintiff: (1) had not engaged in substantial gainful activity since February 7, 2018, the application date; and (2) had the severe impairments of ontogenesis [sic] imperfecta type 1, degenerative joint disease of the right elbow, degenerative joint disease of the right wrist status post arthroscopy and ulnar shortening osteotomy, degenerative disc disease, asthma, and obesity, that significantly limited her ability to perform basic work activities as required by SSR 85-28. (Tr. 17)[9]

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20

---

[8] The vocational expert noted that all of her proposed jobs were classified as sedentary. (Tr. 73)
[9] The ALJ again found Plaintiff's PCOS, hypertension, hypokalemia, vitamin D deficiency and GERD were nonsevere physical impairments. (Tr. 17) The ALJ did note, however, that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (*Id.*)

C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  (Tr. 19)

In so finding, the ALJ stated in relevant part as follows:

> The severity of the claimant's physical impairments, considered singly and in combination, do not meet or medically equal the criteria of any listed impairment.  The undersigned has considered the claimant's obesity throughout this decision under the provisions of SSR 19-2p.  However, there is no evidence that the claimant's obesity alone, or in combination with another impairment, meets or medically equals a listing or more than minimally affects the claimant['s] ability [to] perform routine movement and necessary physical activities for work, such as standing, walking, and lifting.
>
> The undersigned has considered the claimant's degenerative disc disease under listing 1.15, Disorders of the skeletal spine resulting in compromise of a nerve root, and 1.16, Lumbar spinal stenosis resulting in compromise of the cauda equina.  The undersigned has considered the claimant's degenerative joint disease under listing 1.18, Abnormality of a major joint(s) in any extremity.  The claimant has no acceptable evidence of nerve root compromise, compromise of the cauda equina, or abnormality of any joint resulting in a medical need for a walker, cane, or other assistive device or of an inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.  As noted below, the claimant has full strength in her extremity, nearly full range of motion, and was able to perform small motor tasks without issue at the consultative exam.

(Tr. 19 (emphasis in original))  The ALJ did not discuss Listing 1.23 in her opinion, despite the fact that Plaintiff's attorney specifically requested that she consider the listing in a letter dated May 10, 2021.  (Tr. 419)

The ALJ found that, although "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms", "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 20)  For example, the ALJ noted that although Plaintiff fractured her wrist in 2016 and initially healed poorly, she had a revision surgery in 2017 with improvement.  (*Id.*)  Further, although she continued to have

13

some popping and pain with range of motion, the pain was mild, Plaintiff's x-rays confirmed stable position and alignment, and her exams noted she lacked only a few degrees of range of motion. (Tr. 20-21)  With respect to the condition of Plaintiff's upper right extremity since the initial hearing, the ALJ stated as follows:

> The claimant's ulnar plate was removed in July 2019 due to pain (Exhibit 14F/1) and she did well postoperatively, being cleared to discontinue[] her brace in September 2019 (Exhibits 20F and 30F).  Her x-rays showed improvement and no new fractures (Exhibit 35F).  She fractured her finger in November 2019 and was given a splint (Exhibit 29F).  Her exams, aside from her acute unrelated issues, were normal and she was working on increasing her cardiovascular exercise (Exhibits 21F and 25F).  The claimant fell again in October 2020, but her exams were normal aside from tenderness, she had full strength, and otherwise denied any issues….

(Tr. 21)

The ALJ considered the medical opinions in the record, and as relevant here found that Dr. Nancy Ceaser's July 2, 2018 opinion was "unpersuasive".  (Tr. 22)  Specifically, the ALJ noted "Dr. Ceaser found the claimant limited to the light exertional level, but her opinion was inconsistent and unsupported by the updated records, which showed additional limitations."  (*Id.*) The ALJ found Dr. Nirmala Mathew's June 13, 2018 opinion was "partially persuasive", because

> Dr. Nirmala [sic] noted that the claimant could not lift more than 5 pounds. It is somewhat unclear if this was intended as an observation or opinion regarding a limitation, and if the limitation was five pounds total or five pounds with each arm.  Based on the claimant's reported activities and objective medical evidence, it appears she is able to lift five pounds with each arm, for a total of ten pounds.

(*Id.*)

The ALJ considered the opinions of Plaintiff's treating physician, Dr. Eric Rush.  She summarized Dr. Rush's first opinion as follows:  "Dr. Rush noted the claimant could lift 10 pounds, stand and walk for 1 hour, sit for 4 hours, had significant limitations with the use of her hands, that her pain would interfere with her concentration, and she would be late two times a month."  (Tr.

14

22)  The ALJ founds this opinion "unpersuasive", as "[w]hile the limitation to lifting 10 pounds

was consistent with the claimant's medical records, his other findings were not supported by the

records, [] grossly normal mental and physical exams, and lack of acute care." (*Id.*)  With respect

to Dr. Rush's second opinion, that Plaintiff had limited use of her right arm for any sort of basic

and occupational activities, the ALJ found as follows:

> His opinion was inconsistent and unsupported by the record and his own
> treatment records.   The context of the opinion was in the immediate
> recovery from her arm surgery, related to an issue not within his area of
> expertise (she had seen him for a [*sic*] genetic counseling), and inconsistent
> with the subsequent orthopedic records, which did not support such extreme
> limitations.

(Tr. 22-23)

The ALJ concluded as follows:

> The claimant's records did not support her reported limitations due to pain
> and by [and] large outside of her acute injuries or illnesses, her exams were
> normal.   The claimant's wrist required several surgeries, but her orthopedic
> exams and the notes by her doctor did not support her alleged manipulative
> limitations.   Notably, most of the surgeries were prior to the application
> date.   While the claimant has several falls, outside of the brief period she
> was injured and used a brace, her exams did not support a gait problem or
> otherwise balance problems.   These issues in consideration of her obesity
> supported limiting her to the sedentary level with additional restrictions but
> was not preclusive of work.

(Tr. 23)

After "careful consideration of the entire record", the ALJ determined that Plaintiff had the

RFC to perform sedentary work, except that:

> the claimant can never climb ladders, ropes, or scaffolds.  The claimant can
> occasionally climb ramps and stairs, balance, stoop, and kneel.   The
> claimant can never crawl.  The claimant can have no concentrated exposure
> to extreme heat, [c]old, wetness, humidity, vibration, and respiratory
> irritants such as dust, fumes, odors, gases, and poor ventilation.   The
> claimant can have no exposure to unprotected heights or hazardous
> machinery.  She can frequently handle, finger, and feel.

(Tr. 19)  Based on the vocational expert's testimony, the ALJ found that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy, such as addresser, document preparer, and information clerk.  (Tr. 24)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since February 7, 2018, the date the application was filed.  (*Id.*)

Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-5)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

With regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in her Statement of Uncontroverted Material Facts, which the Commissioner admitted with certain additions and clarifications.  (ECF Nos. 17-1, 18-1)  The Court will cite to specific portions of the transcript as needed to address the parties' arguments.

### III.    Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ failed to consider Listing 1.23 for a non-healing or complex fracture of the right ulna (forearm).  (ECF No. 17)  In response, the Commissioner asserts that while the ALJ did not specifically identify Listing 1.23, she considered evidence in connection with the medical impairments that Plaintiff alleges met or equaled the listing, and properly found that they did not. (ECF No. 18)

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind

would find it adequate to support the Commissioner's conclusion." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting <u>*Prosch v. Apfel*</u>, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." *Id.* (quoting <u>*Prosch*</u>, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Listing 1.23 (Non-healing or Complex Fracture of an Upper Extremity)

Plaintiff argues that the ALJ erred at step three of the sequential evaluation because she did not consider whether Plaintiff's debility met or equaled the impairment in Listing 1.23, Non-healing or complex fracture of an upper extremity.  (ECF No. 17, P. 3).  Plaintiff maintains the omission necessitates remand, as "Defendant cannot on appeal provide a basis for the ALJ's action that was not provided first by the ALJ."  (*Id.*, P. 2, citing *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001)).  The Commissioner counters the ALJ did not err at step three, because while she did not specifically identify Listing 1.23, the ALJ considered evidence in connection with the medical impairments that Plaintiff alleges met or equaled the listing, and properly found that they did not.  (ECF No. 18)

17

"'[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.'" *Lott v. Colvin*, 772 F.3d 546, 549 (8ᵗʰ Cir. 2014) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)). "'That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits *without a determination whether he actually can perform his own prior work or other work.*'" *Lott*, 772 F.3d at 549 (emphasis in original) (quoting *Sullivan*, 493 U.S. at 532). "'If the claimant wins at the third step (a listed impairment), [s]he must be held disabled and the case is over.'" *Id.* (quoting *Jones v. Barnhart*, 335 F.3d 697, 699 (8ᵗʰ Cir. 2003)).

"'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.'" *Igo v. Colvin*, 839 F.3d 724, 729 (8ᵗʰ Cir. 2016) (emphasis in original) (quoting *Jones v. Astrue*, 619 F.3d 963, 969 (8ᵗʰ Cir. 2010)). "'An impairment that manifests only some of the [the listing] criteria, no matter how severely, does not qualify.'" *Lott*, 772 F.3d at 549 (alteration in original) (quoting *McCoy*, 648 F.3d at 611-12). Moreover, the "severity standards for Listing-level impairments are intentionally high, because the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary and ends the sequential process." *Moss v. Berryhill*, No. 4:18-CV-189 NCC, 2019 WL 1275070, at *3 (E.D. Mo. Mar. 20, 2019) (alteration in original) (internal quotation marks and citations omitted). The claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria for a specific listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8ᵗʰ Cir. 2004).

In order to meet or equal Listing 1.23, a claimant must demonstrate:

A.  Nonunion or complex fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management (see 1.00O1[10]) directed toward restoration of functional use of the extremity.

---

[10] Section 1.00O1 states the Commissioner will determine the claimant's upper extremity fracture is no longer under continuing surgical management "when the last surgical procedure or medical

18

AND

B. Medical documentation of an inability to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4[11]) that has lasted, or is expected to last, for a continuous period of at least 12 months.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.23.

In her decision, the ALJ did not address Listing 1.23.  She did, however, consider Plaintiff's degenerative joint disease under Listing 1.18, Abnormality of a major joint(s) in any extremity. (Tr. 19)  In order to meet Listing 1.18, a claimant must document the following:

A. Chronic joint pain or stiffness.

AND

B. Abnormal motion, instability, or immobility of the affected joint(s).

AND

C. Anatomical abnormality of the affected joint(s) noted on:
1. Physical examination (for example, subluxation, contracture, or bony or fibrous ankylosis); or
2. Imaging (for example, joint space narrowing, bony destruction, or ankylosis or arthrodesis of the affected joint).

AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

---

treatment directed toward the re-establishment or improvement of function of the involved part has occurred."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00O1.

[11] Section 1.00E4 defines fine and gross movements as follows:

Fine movements, for the purposes of these listings, involve use of your wrists, hands, and fingers; such movements include picking, pinching, manipulating, and fingering.  Gross movements involve use of your shoulders, upper arms, forearms, and hands; such movements include handling, gripping, grasping, holding, turning, and reaching.  Gross movements also include exertional abilities such as lifting, carrying, pushing, and pulling.

Examples of performing fine and gross movements include, but are not limited to, taking care of personal hygiene, sorting and handling papers or files, and placing files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00E4.

1. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or
3. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.18.  Thus, while Listing 1.23 requires "[m]edical documentation of an inability to independently initiate, sustain, and complete work-related activities involving fine and gross movements", Listing 1.18 requires the claimant to show "[a]n inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements."

At step three of the sequential analysis, the ALJ did not specifically address Listing 1.23. She did consider Listing 1.18, however, and found the medical evidence did not support a finding that Plaintiff met or equaled the criteria therein, as follows:

> The claimant has no acceptable evidence of….an inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.  As noted below, the claimant has full strength in her extremity, nearly full range of motion, and was able to perform small motor tasks without issue at the consultative exam.

(Tr. 19 (emphasis in original))

"Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion, as it does in this case."  *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (citations omitted); accord *Vance v.*

20

*Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017).  *See also Moore ex rel. Moore v. Barnhart,* 413 F.3d 718, 721 n. 3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention [the particular listing] does not affect our review."); *Heintz v. Berryhill*, No. 4:16-CV-1894 ACL, 2018 WL 1211172, at *5 (E.D. Mo. Mar. 8, 2018) (ALJ did not reversibly err in failing to consider Listing 1.03 where she found the plaintiff did not satisfy the criteria for Listing 1.02).[12]

Plaintiff claims that the ALJ erred at step three, because Plaintiff "produced evidence of repeated surgical procedures performed on her right ulna (forearm), resulting in continuing pain and limits on her use of that arm for sustained work-related activities involving fine and gross movements with that arm."  (ECF No. 17, P. 3).  Plaintiff continues that "[i]n finding that no listings were met or equaled, the ALJ did not describe consideration of Listing 1.23, citing instead to Listing 1.18 (degenerative joint disease) which requires bilateral lack of use of arms (Listing 1.23 does not)."  (*Id.*)

Plaintiff identifies records that support her allegations that she continued to experience problems with her right upper extremity through at least July 2019.  However, "'[i]f substantial evidence supports the [ALJ's] decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome.'"  *Moss*, 2019 WL 1275070, at *9 (quoting *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010)).

---

[12] Plaintiff's cited case, *Banks v. Massanari*, is not to the contrary.  There, the Eighth Circuit Court of Appeals held that "'[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised."  *Banks*, 258 F.3d at 824 (quoting *Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998) (discussing the limitations on the rule made by the Supreme Court in *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943))).  The Court continued to state that its review of the ALJ's decision revealed he "did in fact make the factual findings necessary for the district court's alternative holding", and thus, "the general limitation on a reviewing court's ability to use reasons not utilized by the agency is not applicable to this case."  *Id.*

The Court finds there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's impairments did not meet or medically equal those set forth in Listing 1.23.  First, while Plaintiff did suffer a complex fracture[13] of an upper extremity in November 2016, upon remand from the Appeals Council she presented no evidence that she was "under continuing surgical management directed toward restoration of functional use of the extremity."  Plaintiff failed to present the required evidence, despite the fact that it was Plaintiff's attorney who requested that the ALJ consider Listing 1.23.  (Tr. 419)  The ALJ noted Plaintiff's failure to provide evidence of continuing surgical management, stating as follows:  "The claimant's wrist required several surgeries, but her orthopedic exams and the notes by her doctor did not support her alleged manipulative limitations.  *Notably, most of the surgeries were prior to the application date.*"  (Tr. 23 (emphasis added))  Furthermore, while the SSA Appeals Council instructed the ALJ to obtain additional evidence concerning Plaintiff's right upper extremity impairments, including updated treating records (Tr. 119), Plaintiff offered little proof of supplemental treatment, instead conceding that she rarely followed-up in 2020 due to the pandemic.  (Tr. 66-67)

Second, while Plaintiff claims an inability to use her upper right extremity "to independently initiate, sustain, and complete work-related activities involving fine and gross movements", the ALJ cited to substantial evidence in the record demonstrating otherwise.  Plaintiff's final surgery took place on July 26, 2019, and since that time several examining doctors stated that she was healing well.  For example, on August 7, 2019, Plaintiff's surgeon, Dr. Lindley Wall, reported the following:

---

[13] Section 1.00N defines "complex fracture" as "a fracture with one or more of the following:  a) Comminuted (broken into many pieces) bone fragments; b) Multiple fractures in a single bone; c) Bone loss due to severe trauma; d) Damage to the surrounding soft tissue; e) Severe cartilage damage to the associated joint; or f) Dislocation of the associated joint."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00N2.

> Jennifer N Schoenfeld is a 34-year-old female who had a right ulnar
> shortening osteotomy for ulnar-sided wrist pain in January 2019.  She
> healed her osteotomy and requested hardware removal, which was done on
> July 26, 2019.   Because of her osteogenesis imperfecta a flexible
> intramedullary nail was placed down the ulna to prevent fracture.  She now
> returns for a postop check almost 2 weeks out from surgery.  She is doing
> well, pain is controlled, splint removed in the office…
> On the right side, there is excellent elbow, forearm, wrist, and hand
> motion….
> She is doing well, incisions are healing appropriately, progressing as
> expected.  No complaints.

(Tr. 978, 979)  During a follow-up appointment on September 18, 2019, Dr. Wall reported as

follows:

> [Patient] has been in a wrist brace.  She states she is having no pain….
> Examination of the right upper extremity reveals sensations grossly intact.
> Excellent wrist range of motion.  Her incisions fully healed no signs of
> infection.  No tenderness to palpation…
> She is now 2 months from her surgery.  At this time she can discontinue use
> of the brace and increase activities.  As long [as] she is doing well I will see
> her back as needed.

(Tr. 1106)  Plaintiff did experience a fracture of a finger on her right hand in November 2019, that

caused pain "over the ulnar aspect of the midforearm near the proximal extent of her previous

incision."  (Tr. 1108)  By February of 2020, however, there was no mention of her forearm in

Plaintiff's examination notes, and she was discharged to follow-up regarding her finger only as

needed.  (Tr. 1116)  Finally, Plaintiff presented for a physical with Dr. Tyler Mork on January 6,

2020, and reported no acute complaints.  (Tr. 1041)  She followed up with Dr. Mork on March 12,

2020, and reported that she had tried the diclofenac gel on her forearm, the site of one of her

chronic pains, "and it worked."  (Tr. 1045)  The ALJ accounted for these assessments and other

evidence in the record, noting in her opinion that "the claimant has full strength in her extremity,

nearly full range of motion, and was able to perform small motor tasks without issue at the

consultative exam."  (Tr. 19)

23

The burden for establishing disability at step three is on Plaintiff, and it is "a particularly high burden." *Moss*, 2019 WL 1275070, at * 9.  *See also Heintz*, 2018 WL 1211172, at *6; *Simmons v. Colvin*, No. 4:14-CV-1670 NAB, 2015 WL 7758373, at *3-4 (E.D. Mo. Dec. 2, 2015). Upon review of the records, Plaintiff did not satisfy the exacting burden to establish that she was under continuing surgical management directed toward restoration of functional use of her upper right extremity, or that she was unable to use the extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements.  The ALJ thus did not err in determining that Plaintiff was not suffering from a disability, despite her failure specifically to address Listing 1.23.

## IV.    Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff "has not been under a disability, as defined in the Social Security Act, since February 7, 2018, the date the application was filed[.]"  (Tr. 24)

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_Patricia L Cohen_
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of July, 2023